J-S26025-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JABEZ LUIS ABREU | : | |
| | : | |
| Appellant | : | No. 3 MDA 2024 |

Appeal from the Judgment of Sentence Entered December 20, 2023
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s): CP-31-CR-0000464-2022

BEFORE: PANELLA, P.J.E., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY OLSON, J.: **FILED: SEPTEMBER 9, 2024**

Appellant, Jabez Luis Abreu, appeals from the judgment of sentence entered on December 20, 2023. We affirm.

The trial court ably summarized the underlying facts of this case:

On May 28, 2022, [Appellant] was staying at the vacation home of his cousin, Alaric Abreu, and Alaric's paramour, Erin Barley, located in Penn Township, Huntingdon County. Alaric and Erin had invited [Appellant] and other friends and family members up to their vacation home for the Memorial Day holiday weekend and to celebrate Alaric's birthday. The group that had been invited included Sean Heckman, a mutual friend. For unknown reasons [Appellant] had been in a bad mood since early in the trip, and when he was invited to go with Alaric, Erin, and the others to Raystown Lake for an afternoon of boating and swimming, he elected to stay behind at the house. The group was away from the house from approximately 11:00 am to 4:00 [p.m.]

While the group had been at the lake, [Appellant] had been texting with Alaric. While Alaric could not recall the specific details of the texts, they pertained to [Appellant's] mood, and [Appellant] relayed that he was going to leave and walk to

the train station to get a ride home. Alaric told [Appellant] that trying to walk there was not a good idea and that one of them would give him a ride to the train station after they returned. [Appellant] declined.

Alaric, Erin, and Sean had each seen [Appellant] drinking alcohol (beer and liquor) at various times during the day, and when they returned from the lake, they observed [Appellant] to be intoxicated. [Appellant] admitted that he had been drinking.

The incident that led to [Appellant's] conviction began when Sean heard [Appellant] yelling and carrying on in the sunroom at the vacation house. Sean went in to try to calm [Appellant] down. He did not recall what [Appellant] was yelling about in detail, but recalled specifically "he said he's tired of Alaric's shit . . . and he just wants to leave." Sean was having some success in calming [Appellant] down until Alaric came into the room to get a drink. [Appellant] began yelling at Alaric, and Sean asked Alaric to leave so he could calm things down again. As Alaric was attempted to walk out, [Appellant] stepped in his path and "got in [his] face," standing nearly chest-to-chest with him. Alaric could not recall what [Appellant] was saying specifically, but did remember that half of it was unintelligible "because [Appellant] was slurring his words." The situation quickly turned physical. Alaric could not recall whether he pushed [Appellant] in an attempt to create distance so he could leave the room, or if [Appellant] began by pushing Alaric as Alaric was trying to step by him. (Sean's recollection was that [Appellant's] first move was to try to punch Alaric, but miss[ed] landing the blow). [Appellant] then quickly got Alaric into what was alternately referred to by the witnesses as a "headlock" or "reverse headlock," the description of which more accurately matches what is commonly known as a chokehold, with [Appellant] positioned behind Alaric with his arm encircling Alaric's neck, cutting off Alaric's ability to breathe.

It was at this time that Erin entered the sunroom, having been drawn there by the sound of the verbal altercation.

> So when I walked up – voices had been elevated and when I walked in the sunroom [Appellant] had Alaric in a

headlock and Alaric was struggling to breathe and it was just two big guys and not breaking apart. And Alaric was trying to get out of the headlock and [Appellant] was thrown off of him and when he looked up at us continuing to fight, [Appellant] had a large gash on his head.

Alaric's and Sean's testimony was in line with Erin's. Both testified that the incident moved quickly from the first point of physical engagement to [Appellant] putting Alaric into the "headlock," from the headlock to the two struggling for physical control, and from the two struggling for physical control to the two ending up on the floor with Alaric working to catch his breath and [Appellant] bleeding from a laceration on his head. The entire incident happened quickly enough that none of them were sure precisely how [Appellant] and Alaric wound up on the floor or how the laceration occurred on [Appellant's] head. []Alaric's recollection of what occurred once [Appellant] put him in the [headlock was as follows:]

I couldn't breathe. I remember pushing him back into the glass door area where there was a table, a table and chairs, and he was on the ground. I was like on top of him and that's when I saw he had a cut on his face and I went, this is an emergency and tried to calm him down and get him to the hospital.

Neither Erin nor Sean recalled seeing Alaric strike or punch [Appellant] in any specific manner (that would have caused the head laceration or otherwise), and Alaric did not recall doing so.

Erin, Sean, and Alaric were in agreement that the physical altercation stopped once [Appellant] realized he was bleeding, and that [Appellant] remained verbally combative and reluctant to accept help until it became clear that he had to. Erin called 911, put the call on speaker, and the group initially sought to have [Appellant] transported to the hospital by ambulance. [Appellant] refused, but did finally acquiesce to allowing them to transport him to the hospital in their own vehicle.

[Appellant] was interviewed at the hospital by Pennsylvania State Police Trooper Cody Booher. The version of events that [Appellant] told Trooper Booher, and the testimony that he

- 3 -

gave at trial, differ significantly from the testimony of Erin, Sean, and Alaric. [Appellant] claimed that Alaric had been treating him poorly, and that he had found evidence of cocaine use in the house. He also claimed that he had called his parents, told them of the alleged cocaine use, and attempted to have them come pick him up. With respect to the incident itself, [Appellant] claimed that while in the sunroom Alaric tugged on his arm to get his attention, he turned around to find Alaric and Sean confronting him "in his face" with their fists clenched, the two dared him to go outside to "scrap," he tried to "gently" push Alaric away from him, and then Alaric grabbed him. When Alaric grabbed him, [Appellant] grabbed Alaric's head in an attempt to prevent Alaric from using his hands, and Alaric lifted [Appellant] up and slammed him to the ground. [Appellant] woke up on the ground with one of Alaric's hands on his throat, and Alaric then punched him in the forehead. Sean said "whoa, whoa" and Alaric stopped, got up, and stepped away while Sean handed [Appellant] a sweatshirt to try to staunch the bleeding. [Appellant] further claimed that Erin was not present, but another friend, Timmy, was there and witnessed the incident.

[Appellant] suffered a five-inch laceration to his scalp which required stiches to close. The wound started at the hairline slightly to the right of center, and extended rearward at a slight angle toward the right side of his head. Alaric suffered carpet burns on his legs, arms, and chin. He also had pain in his chest (Erin testified that she heard [Appellant] hit Alaric in the chest, and Alaric thought that it may have occurred and was the source of the pain). The evidence of alleged cocaine use that [Appellant] found was a straw, white powder, and a Costco store card with Alaric's name and picture on it sitting on the keyboard tray of a desk, which he took a picture of. Sean and Alaric did not recall [Appellant] making any allegations of drug use at the vacation house (Erin was not asked about this).

The [trial court] found the testimony of Erin, Sean, Alaric, and Trooper Booher to be credible. [Appellant's] testimony was not credible.

Trial Court Opinion, 2/28/24, at 1-5 (footnotes and citations omitted).

Following a bench trial, the trial court found Appellant guilty of harassment, graded as a summary offense.[1] On December 20, 2023, the trial court sentenced Appellant to serve 30 to 90 days in jail for this conviction.

Appellant filed a timely notice of appeal. He raises two claims to this Court:

> 1. Whether the evidence was insufficient to support each element of [the crime of harassment]?
>
> 2. Whether the Commonwealth failed to disprove [Appellant's] claim of self-defense with proof beyond a reasonable doubt in its prosecution of the charge of [harassment]?

Appellant's Brief at 6.

Appellant first claims that the evidence was insufficient to support his conviction. We review Appellant's sufficiency of the evidence challenge under the following standard:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every

---

[1] 18 Pa.C.S.A. § 2709(a)(1).

element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Callen*, 198 A.3d 1149, 1167 (Pa. Super. 2018) (citations and quotation marks omitted).

Appellant was convicted of harassment under 18 Pa.C.S.A. § 2709(a)(1). This subsection declares:

A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:

(1) strikes, shoves, kicks or otherwise subjects the other person to physical contact, or attempts or threatens to do the same.

18 Pa.C.S.A. § 2709(a)(1).

On appeal, Appellant contends that the evidence was insufficient to support his conviction for harassment because, as he testified, "his action in grasping [Alaric] was done [] with the purpose of trying to prevent [Alaric] from using his hands, which was a defensive action intended to prevent any kind of assault from taking place." Appellant's Brief at 20.

Appellant's claim on appeal fails, as it improperly views the evidence in the light most favorable to him. When viewed in the light most favorable to the Commonwealth, however, the evidence demonstrates the following. Prior to the harassment, Appellant became intoxicated and angry at Alaric. N.T. Trial, 12/15/23, at 18. When Appellant saw Alaric later in the day, Appellant

- 6 -

yelled at Alaric and then got "close in [Alaric's] face and was yelling at [Alaric]." *Id.* at 18-19. After Appellant "was in [Alaric's] face," Alaric "pushed [his] arm away to get [Appellant] away out of [his] face." Appellant responded by trying to punch Alaric and then by placing Alaric in a chokehold, using such force that Alaric "couldn't breathe." *Id.* at 11, 19, and 23. Further, after Appellant was thrown off of Alaric, Appellant "continued to try to fight everybody, was belligerent to [everyone], wouldn't let [them] help him and just was being combative to everybody." *Id.* at 5.

The above evidence refutes Appellant's claim that the chokehold was performed in a "defensive" manner. Moreover, the evidence is sufficient to support the trial court's conclusion that Appellant instigated the fight by getting "close in [Alaric's] face and [] yelling at [Alaric]" and Appellant then committed the summary offense of harassment by placing Alaric in a chokehold. Appellant's sufficiency argument is meritless.

Next, Appellant claims that the Commonwealth "failed to disprove [Appellant's] claim of self-defense with proof beyond a reasonable doubt." Appellant's Brief at 24.

In relevant part, Section 505 of the Crimes Code provides:

> § 505. Use of force in self-protection
>
> (a) Use of force justifiable for protection of the person.--The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

18 Pa.C.S.A. § 505.

The term "unlawful force" is defined as follows:

"Unlawful force." Force, including confinement, which is employed without the consent of the person against whom it is directed and the employment of which constitutes an offense or actionable tort or would constitute such offense or tort except for a defense (such as the absence of intent, negligence, or mental capacity; duress; youth; or diplomatic status) not amounting to a privilege to use the force. Assent constitutes consent, within the meaning of this section, whether or not it otherwise is legally effective, except assent to the infliction of death or serious bodily injury.

18 Pa.C.S.A. § 501.

"If the defendant properly raises self-defense under Section 505 of the Pennsylvania Crimes Code, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant's act was not justifiable self-defense." *Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa. Super. 2014) (quotation marks and citations omitted). Although the Commonwealth is required to disprove a claim of self-defense . . . [the factfinder] is not required to believe the testimony of the defendant who raises the claim." *Commonwealth v. Chine*, 40 A.3d 1239, 1243 (Pa. Super. 2012) (citation omitted). Further, in a case that "involves a mere battery," "force may be met with force so long as it is only force enough to repel the attack." *Commonwealth v. Pollino*, 467 A.2d 1298, 1301 (Pa. 1983).

Appellant testified that Alaric initially attacked him and that he was merely attempting to defend himself. *See* N.T. Trial, 12/15/23, at 33-34. Therefore, Appellant properly raised a claim of self-defense and the burden

was placed on the Commonwealth "to prove beyond a reasonable doubt that [Appellant's] act was not justifiable self-defense." **See Smith**, 97 A.3d at 787. Viewing the evidence in the light most favorable to the Commonwealth, the Commonwealth satisfied its burden. To be sure, even if Alaric's "push" could constitute the use of "unlawful force" against Appellant,[2] Appellant's action of placing Alaric in a chokehold – using such strength that Alaric "couldn't breathe" – far exceeded the amount of force that was necessary "to repel the attack." **See Pollino**, 467 A.2d at 1301. Thus, the evidence was sufficient to support the trial court's factual conclusion that Appellant used excessive force in response to Alaric's actions and that the Commonwealth successfully disproved Appellant's claim of self-defense beyond a reasonable doubt. Appellant's claim to the contrary fails.

---

[2] Alaric testified that he only touched Appellant once – and that he did so only after Appellant aggressively got "close in [Alaric's] face and was yelling at [Alaric]." N.T. Trial, 12/15/23, at 18-19. Alaric testified that, after Appellant did this, Alaric "pushed [his] arm away to get [Appellant] away out of [his] face." **Id.** at 23.

Judgment of sentence affirmed.  Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>9/9/2024</u>